## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JODI LA COE, | : | No. 4:14-cv-01818 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| THE PENNSYLVANIA STATE | : | |
| UNIVERSITY, MEHRDAD | : | |
| HADIGHI, and JAMES KALSBEEK, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

## March 24, 2016

Upon constructing her Second Amended Complaint, Jodi La Coe, Plaintiff here and a former architectural professor at The Pennsylvania State University, attempted to stretch to their breaking points the clear bounds of certain sex discrimination laws on which she relied. As many a hasty architect has disappointedly discovered however, a structure can stand only as sturdy as the quality of the materials from which it was drawn. Because Plaintiff's claims against her former co-worker Professor James Kalsbeek suffer from significant plausibility shortcomings and various procedural holes, Defendant Kalsbeek is correct in contending that Plaintiff's Second Amended Complaint is structurally unsound. Consequently, all of Plaintiff's claims against Kalsbeek, which upon

1

close inspection involve nothing more than personal grievances against a co-worker, are dismissed in whole and with prejudice in accordance with the following reasoning.

## I.   BACKGROUND

For all intents and purposes, this is action is an employment discrimination lawsuit alleging systemic discrimination against women at an institutional level. Plaintiff Jodi La Coe worked as a tenure-track Assistant Professor of Architecture at The Pennsylvania State University (hereinafter the "University") beginning in 2007.[1] After seven years with the University, Plaintiff was denied tenure.[2]

According to Plaintiff, the University's tenure decision was due not to any professional shortcomings on her own part, but rather to a discriminatory animus against women that pervaded the University's Department of Architecture. As Plaintiff fashions it in her Second Amended Complaint, "the Architecture Department historically has had a dearth of tenured female professors and a glass ceiling."[3]

Even viewing the facts in the light most favorable to the Plaintiff, the existence of this purported "glass ceiling" is nonobvious to the Court on the face of the Second Amended Complaint. According to Plaintiff, for example, only nine

---

[1] ECF No. 32 at 6.
[2] Pl.'s Second Amd. Compl., ECF No. 27 ¶ 35.
[3] Id. at ¶ 39.

2

female architecture professors have ever held tenure-track professorships as of

2012.[4] Of those nine female professors, Plaintiff acknowledges that one has yet to

be evaluated but five of the other eight, or sixty-three percent (63%), were granted

tenure.[5] Citing another purported instance of sexual discrimination against women,

Plaintiff claims that the Architectural Department has never had a female

Department Head.[6] Perhaps that fact is a natural consequence of the Department

having only ever employed nine female tenure-track professors or perhaps it is a

consequence of the historical dearth of female participation in disciplines such as

architecture; regardless, the inference of sex discrimination at an institutional level

is largely unclear from the bulk of Plaintiff's allegations. In the Court's view, the

same goes for Plaintiff's rather innocuous suggestions of uneven pay scales

between men and women in the Architectural Department.[7] That such differences

were attributable to sex rather than some other lurking variable has yet to be seen

at this point in the litigation.

Conceivably, Plaintiff's institutional claim of sex discrimination may have

some underlying merit, but in the end it also may not. Nevertheless, that is largely

a question for another day, a question that all parties would do well to consider

---

[4] Id. at ¶ 40.
[5] Id. at ¶ 41. See also ECF No. 27 Ex. 1 at ¶ 21.
[6] ECF No. 27 at ¶ 47.
[7] Am. Compl., ECF No. 12 ¶¶ 69–82 ("The difficult problem with Professor Kalsbeek began in 2004 early in Professor La Coe's career at Penn State.").

moving forward. The important takeaway from this review of the litigation is that its initial prosecution by Plaintiff was framed entirely as an action to redress systemic sexual discrimination. For example, Plaintiff's initiating document, her August 7, 2013 Pennsylvania Human Rights Commission (PHRC) Charge, complained of systemic sexual discrimination at the University and more particularly, in the Architectural Department itself. In fact, the thrust of Plaintiff's thirty-eight paragraph PHRC Charge went precisely to the institutional nature of the discrimination she faced, centering on the departmental statistics I have outlined above.[8]

By the time the case had progressed to federal court, one familiar with Plaintiff's claims at birth might not have even recognized them at maturity. In addition to continuing her sweeping allegations of sex discrimination against the University, Plaintiff advanced in her September 18, 2014 Complaint, for the first time, individual causes actions against a former co-worker, Professor James Kalsbeek. Not only was Professor Kalsbeek not named in Plaintiff's PHRC Charge, but he played a rather minor and removed, albeit strange, role in the context of Plaintiff's sex discrimination claims.

Despite Plaintiff's tenure denial occurring nearly ten years later, the claims that she introduced against Kalsbeek in her federal Complaint dated back to

---

[8] See id., Ex. 1.

isolated incidents occurring in 2004 and subsequent academic semesters.[9]

Specifically, Plaintiff and Defendant were co-workers in the Architecture

Department and even co-taught certain courses early in Plaintiff's career.[10] From

Plaintiff's point of view, Kalsbeek "wanted to be in a romantic relationship with

her" and expressed that such a relationship "would be a good path for her life to

take."[11] Plaintiff points to three discrete and by this point in time, rather foggy past

encounters with Kalsbeek: one in which he "bad-mouthed her to their students,"

one in which he showed up uninvited at her house, and one in which he presented

her with both a greeting card with his eyeglass prescription written inside and a

signed copy of the Illustrated Encyclopedia of Sex.[12] Plaintiff contends that

Kalsbeek, despite his status as her co-worker in the Department, was her "de facto"

supervisor, because for approximately three to four academic semesters, he

exercised "control over the funding of a workplace-program."[13] As might already

be evident, the nexus between these isolated incidents involving Kalsbeek and

Plaintiff's ultimate tenure denial is appreciably distant at best.

Be that as it may, Defendant Kalsbeek found himself ensnarled in Plaintiff's

eleven-count Second Amended Complaint, a document that reaches to the far

---

[9] See ECF No. 27 at ¶¶ 87–94.
[10] ECF No. 32 at 6.
[11] Id.
[12] Id. at 6–7.
[13] See id. at 16–17.

corners of the law for support in what might be described as a scattershot approach to bringing a rather plain sexual discrimination claim. The matter is therefore now before the Court on Defendant Kalsbeek's Motion to Dismiss the Second Amended Complaint as it applies to him. Those claims averred against Kalsbeek include counts of gender discrimination and retaliation in violation of the Pennsylvania Human Relations Act, as well as a denial of equal protection count brought pursuant to 42 U.S.C. §1983.[14]

Kalsbeek contends that the Second Amended Complaint "virtually mirrors" the original and First Amended Complaint and therefore "fails to assert any plausible claims" against him. For the reasons that follow, the Court concludes that Defendant Kalsbeek is correct. Plaintiff's claims against him are procedurally defective and fail to state plausible claims under the laws on which she relies. I will now grant Kalsbeek's Motion to Dismiss in full and with prejudice.

## II.   LAW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may file a motion to dismiss for "failure to state a claim upon which relief can be granted." Such a motion "tests the legal sufficiency of a pleading" and "streamlines litigation

---

[14] See ECF No. 27.

by dispensing with needless discovery and factfinding."[15] "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[16] This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[17]

Beginning in 2007, the Supreme Court of the United States initiated what some scholars have termed the Roberts Court's "civil procedure revival" by significantly tightening the standard that district courts must apply to 12(b)(6) motions.[18] In two landmark decisions, Bell Atlantic Corporation v. Twombly and Ashcroft v. Iqbal, the Roberts Court "changed . . . the pleading landscape" by "signal[ing] to lower-court judges that the stricter approach some had been taking was appropriate under the Federal Rules."[19] More specifically, the Court in these two decisions "retired" the lenient "no-set-of-facts test" set forth in Conley v. Gibson and replaced it with a more exacting "plausibility" standard.[20]

Accordingly, after Twombly and Iqbal, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

---

[15] In re Hydrogen Peroxide Litigation, 552 F.3d 305, 316 n.15 (3d Cir. 2008) (Scirica, C.J.) (quoting Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)). Neitzke v. Williams, 490 U.S. 319, 326–27 (1989).

[16] Neitzke, 490 U.S. at 326 (citing Hishon v. King & Spalding, 467 U. S. 69, 73 (1984)).

[17] Neitzke, 490 U.S. at 327.

[18] Howard M. Wasserman, The Roberts Court and the Civil Procedure Revival, 31 Rev. Litig. 313 (2012).

[19] 550 U.S. 544 (2007); 556 U.S. 662, 678 (2009). Wasserman, supra at 319–20.

[20] Iqbal, 556 U.S. at 670 (citing Conley v. Gibson, 355 U.S. 41 (1957)) ("[a]cknowledging that Twombly retired the Conley no-set-of-facts test").

to relief that is plausible on its face.'"[21] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[22] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[23] Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[24]

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[25] No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[26]

When disposing of a motion to dismiss, a court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."[27] However, "the tenet that a court

---

[21] Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).
[22] Iqbal, 556 U.S. at 678.
[23] Connelly v. Lane Const. Corp., No. 14-3792, 2016 WL 106159, at *3 (3d Cir. Jan. 11, 2016) (Jordan, J.) (internal quotations and citations omitted).
[24] Twombly, 550 U.S. at 556.
[25] Iqbal, 556 U.S. at 679.
[26] Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557 (internal quotations omitted)).
[27] Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[28] "After Iqbal, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss."[29] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[30]

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that:

> Under the pleading regime established by Twombly and Iqbal, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[31]

## III.   ANALYSIS

### A.   Plaintiff's PHRA Claims Against Defendant Kalsbeek Must Be Dismissed.

#### 1.   Plaintiff failed to exhaust her administrative remedies when she omitted Kalsbeek's name from her PHRC Charge, and the Glus "identity of interests" exception cannot cure that oversight.

Plaintiff failed to name Defendant Kalsbeek in her PHRC Charge, an often

---

[28] Iqbal, 556 U.S. at 678 (internal citations omitted).
[29] Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.).
[30] Iqbal, 556 U.S. at 678.
[31] Connelly, 2016 WL 106159, at *4 (internal quotations and citations omitted).

fatal omission unless otherwise saved by a narrow, judge-made exception to the

PHRA's clear exhaustion requirements. As explained more fully below, that

exception does not apply here, and Plaintiff's PHRA claims against Kalsbeek fail

because she did not properly exhaust the statutorily prescribed administrative

prerequisites.

Section 955 of the PHRA, its anti-discrimination provision, reads as follows:

> It shall be an unlawful discriminatory practice . . . [f]or any employer because of the . . . sex . . . of any individual . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual . . . , or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual . . . is the best able and most competent to perform the services required.[32]

Furthermore, the PHRA's procedural requirements, laid out in § 959, require

that:

> Any person claiming to be aggrieved by an alleged unlawful discriminatory practice may make, sign and file with the Commission a verified complaint, in writing, which shall state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful discriminatory practice complained of, and which shall set forth the particulars thereof and contain such other information as may be required by the Commission.[33]

"The purpose of requiring an aggrieved party to resort first to the EEOC is

twofold: to give notice to the charged party and provide an avenue for voluntary

---

[32] 43 Pa. Stat. Ann. § 955 (West).
[33] 43 Pa. Stat. Ann. § 959 (West) (emphasis added).

compliance without resort to litigation."[34] The PHRA's procedural exhaustion

requirements are also jurisdictional, meaning that "[a PHRA] action ordinarily may

be brought only against a party previously named in an EEOC action."[35]

Although failing to name a party in the EEOC charge normally results in

dismissal of a subsequent PHRA action brought in federal court, the Third Circuit

in Glus v. G. C. Murphy Co. crafted a narrow judicial exception to such a technical

pre-requisite. Specifically, the Third Circuit "recognize[d] an exception when the

unnamed party received notice and when there is a shared commonality of interest

with the named party."[36] Glus thus instituted a two-part test for overriding the

PHRA's explicit naming requirement: (i) the unnamed defendant must have

received notice of the pending EEOC proceeding and (ii) the unnamed defendant

must have "shared a commonality of interest" with the named defendant. The case

at hand fails both prongs of the Glus test.

"[W]hen a plaintiff fails to name individual defendants in the body of the

EEOC complaint, these defendants have not been put on notice that they could be

sued in their individual capacities—even when they were aware of the complaint's

existence."[37] Federal courts have held, for instance, that the owner of a company

---

[34]  Glus v. G. C. Murphy Co., 562 F.2d 880, 888 (3d Cir. 1977).

[35]  903 F.2d 243, 251 (3d Cir. 1990).

[36]  Schafer v. Bd. of Pub. Educ. of the Sch. Dist. of Pittsburgh, Pa., 903 F.2d 243, 252 (3d Cir.
      1990) (emphasis added).

[37]  Hills v. Borough of Colwyn, 978 F. Supp. 2d 469, 480 (E.D. Pa. 2013).

11

who went unnamed in the pertinent EEOC charge could not be sued even if he "had notice that his company was under investigation for discriminatory conduct."[38] Neither could unnamed managers and supervisors at a health club be sued because "they had no notice [Plaintiff's] claims and were thus deprived of the opportunity to informally resolve those claims" and because "[plaintiff] identifie[d] no evidence demonstrating that either of these men represented to [her] that [they] should be contacted only through [their employer]."[39] Lastly, a hospital's human resource manager who was unnamed in the relevant charge could not later be sued in federal court, despite having contacted the claimant "on numerous occasions" to seek "further information as to the nature and extent of her disability" and having been "aware generally of the EEOC charge."[40]

In line with these authorities, it is evident that the Defendant Kalsbeek here did not receive legally adequate notice of the pending PHRC charge and subsequent proceedings. Plaintiff argues otherwise for two reasons: first, because one paragraph in her thirty-eight paragraph PHRC charge contained a reference to an unnamed professor who was purportedly Kalsbeek and second, because Kalsbeek's name was included in a response letter from her counsel to the EEOC

---

[38] McInerney v. Moyer Lumber & Hardware, Inc., 244 F. Supp. 2d 393, 399 (E.D. Pa. 2002).
[39] Graudins v. Retro Fitness, LLC, 921 F. Supp. 2d 456, 464 (E.D. Pa. 2013).
[40] Lightcap-Steele v. KidsPeace Hosp., Inc., No. CIV.A. 05-02578, 2006 WL 1147476, at *3, *6 n.6 (E.D. Pa. Apr. 27, 2006).

Investigator assigned her case.[41] For the obvious reason that neither of those

documents provided Kalsbeek with sufficient notice as a matter of law, the counts

of the Amended Complaint alleging violations by Kalsbeek must fail.

First, as it relates to Plaintiff's PHRC charge, Plaintiff contends that

Kalsbeek should have been put on notice by her referencing "a male professor with

whom she co-teaches" in paragraph fifteen of her thirty-eight paragraph charge.

Viewing the charge as a whole, Plaintiff states a claim of entrenched, institutional

discrimination—that systemic shortcomings in the way in which the Architecture

Department at the University selects its tenured professors disparately impacts

female candidates. The focus of her charge hardly hinged upon the alleged dispute

between her and Kalsbeek. In fact, the paragraph that mentions the unnamed

professor is framed in such a way as to emphasize that the alleged incidents went

unaddressed by superiors. As the last line of that paragraph states, "Professor La

Coe complained to her senior faculty/management without consequences for the

male professor."[42]

Moreover, as a matter of practice, Plaintiff chose to name certain individuals

while omitting others. For instance, Plaintiff named the Department Head,

Mehrdad Hadighi, and explained his involvement in the alleged discriminatory

---

[41] ECF No. 12 Exs. 1, 2.
[42] ECF No. 12 Ex. 1 ¶ 15.

scheme in numerous of the paragraphs of her PHRC Charge.[43] When the law requires clear notice and naming of potential defendants, Plaintiff's choice to include certain individuals but to omit others not only bears on her lack of mistake, but also evidences her ultimate intent to charge some of those co-workers but not others.

Just as importantly, permitting an individual such as Kalsbeek, who is vaguely referenced in one paragraph of Plaintiff's PHRC Charge, would set an egregiously low threshold for applying the <u>Glus</u> exception. It cannot be the case that a single mention of an unnamed individual in connection with discrete, isolated incidents in a charge document exposes that individual to a lawsuit in federal court without prior notice. Were this Court to hold otherwise, Plaintiff might rightly be able pursue federal lawsuits against anyone in the Architectural Department or in a management position at the University. Again, for obvious reasons, both in terms of judicial economy and in terms of a legislative preference for mediation of such disputes, Kalsbeek lacked sufficient notice solely from the face of Plaintiff's PHRC Charge.

The argument that Kalsbeek obtained adequate notice by virtue of his name being mentioned in a response letter from Plaintiff's counsel to the EEOC Investigator is equally unavailing in the Court's eyes. First, there is no indication

---

[43] ECF No. 12 Ex. 1 ¶¶ 13,14, 16, 30, 34, 35.

14

that Kalsbeek ever had any knowledge of the said letter whatsoever. The letter, written by James B. Lieber, Esquire, counsel for Plaintiff, is addressed to Mr. Paul Southworth, the assigned EEOC Investigator.[44] The letter is carbon-copied to two individuals: Plaintiff and Thomas M. Huber, Esquire, also counsel for Plaintiff.[45] Based on the copy of the letter that Plaintiff attached to her Amended Complaint, it is unclear that counsel for any of the Defendants ever received a carbon copy of this communication, let alone counsel for Kalsbeek or Kalsbeek himself.

Moreover, given that the entire purpose of the PHRA's notice requirement is to enable formal resolution in advance of any formal proceedings, it is difficult to suggest that the January 10, 2014 letter, sent more than five months after Plaintiff's filing of her charge on August 5, 2013, could have cured the Charge's deficiencies. Placing an unnamed defendant on notice five months late in relation to the filing of the charge squandered a significant period of time in which informal resolution could have been attempted.

Having concluded that Kalsbeek lacked the requisite notice that the <u>Glus</u> exception anticipates, I now turn to whether Kalsbeek and the University share an "identity of interests" under applicable law.[46] They do not.

The Third Circuit in <u>Glus</u> enumerated four factors that districts should

---

[44] ECF No. 12 Ex 2 at 1.

[45] <u>Id.</u>

[46] <u>Schafer v. Bd. of Pub. Educ. of the Sch. Dist. of Pittsburgh, Pa.</u>, 903 F.2d 243, 252 (3d Cir. 1990).

consider in determining whether the omission of a defendant's name in an EEOC

charge was excusable and therefore would not deprive the court jurisdiction.[47]

Those factors are:

(1)     whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;

(2)     whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;

(3)     whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; and

(4)     whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.[48]

In my view, the first, third, and forth <u>Glus</u> factors weigh decidedly against

Plaintiff. Yet, appealing to the second factor, Plaintiff contends that her omission

of Kalsbeek's name in the charge was harmless because Kalsbeek and the

University share an "identity of interests."[49] In support, Plaintiff primarily argues

that an identity of interests exists because Kalsbeek "had an important role" in her

discriminatory treatment and because the University may ultimately be held liable

---

[47] 562 F.2d 880 (1977).
[48] <u>Id.</u>
[49] <u>See</u> ECF No. 32 at 11–12.

for Kalsbeek's actions under the doctrine of <u>respondeat superior</u>.[50] Neither

contention is enough to overcome the PHRA's explicit notice provisions by using a

narrow, judge-made exception.

If Kalsbeek "had an important role" in the alleged discriminatory conduct,

that is not evident from the PHRA Charge, and that shortcoming is fatal by law.

The paragraph of the Charge that purportedly refers to Kalsbeek amounts to

nothing more than an alleged example of undisciplined mistreatment, an example

that Plaintiff attempts to use to support her general contention that an overarching

system of discrimination against female faculty permeated the University's

Architecture Department. Such an allegation fails to plausibly establish that the

accused played a significant role in the underlying conduct that formed the basis

for Plaintiff's Charge.

In addition, Plaintiff's blanket reliance on the employer-employee

relationship existing between Kalsbeek and the University is inadequate to trigger

the <u>Glus</u> exception. Specifically, Plaintiff cites to <u>Johnson v. PSI Pizza, Inc.</u>, in

which then United States Magistrate Judge, now United States District Judge

Malachy E. Mannion wrote: "As to the second factor, the parties interests are

deeply entwined as the defendant Nolan is an employee of defendant PSI Pizza."[51]

In this Court's view, the <u>Johnson</u> decision is incomplete for our purposes here.

---

[50] <u>See</u> id. at 11–12.
[51] No. CIV.A. 3:11-1698, 2012 WL 4450897, at *5 (M.D. Pa. Sept. 25, 2012).

Employment relationships by their very nature often result in numerous parties'

interests becoming "deeply entwined." What matters under <u>Glus</u> and its progeny,

however, is the extent to which those interests share "an identity" during the

applicable conciliation process that renders the omission of an unnamed defendant

harmless. That conclusion is simply not meant to be taken as given every time an

employment relationship exists between the named and unnamed defendants.

Though they may be coexistent in theory, the interests of an employer and

its employees often stand adversely or in direct conflict with one another. In fact,

imposing <u>respondeat superior</u> liability on employers for employees who have acted

within the scope of their employment gives rise to a quite obvious incentive for

employers to distance themselves from their misbehaving employees. It would be

naïve to assume that an employer and its counsel would spend their time during

mediation advocating on behalf of an absent, unrepresented employee, particular if

that employee had acted wrongly and beyond the scope of the employment

relationship. An equally plausible and perhaps even more likely mode of argument

would involve the employer's emphasizing the rogue nature of the employee's

conduct as a justification for why it should not be held vicariously liable.

The interests of an employer and its employees are likely to conflict so often

that the American Bar Association (ABA) has devoted an entire Model Rule of

Professional Conduct to the generally disfavored nature of dual representation of

employers' and employees' interests. Model Rule of Professional Conduct 1.13

("Organization as Client") provides as follows at subparts (a) and (f):

> (a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.
>
> . . .
>
> (f) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

The Comments to Rule 1.13 go on to explain that such a proscription of dual

representation is appropriate precisely because of the strong propensity for

conflicts of interest to arise in employer-employee cases:

> **Clarifying the Lawyer's Role**
>
> [10] There are times when the organization's interest may be or become adverse to those of one or more of its constituents. In such circumstances the lawyer should advise any constituent, whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation. Care must be taken to assure that the individual understands that, when there is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constituent individual, and that discussions between the lawyer for the organization and the individual may not be privileged.

As a matter of interpretation, Plaintiff's contentions as to common interests

similarly carry little weight when one considers the singular purpose behind the

Glus exception. That exception is a judicially carved loophole to an otherwise clear

legislative text, which therefore merits, in this Court's view, an especially narrow

construction.[52] "Because we are assessing judicially created exceptions to a broad

statutory grant, one of the principles that must guide our inquiry is that judge-made

exceptions to properly enacted statutes are to be narrowly construed."[53] "Indeed,

the Supreme Court has cautioned that, to avoid improper narrowing by courts of

congressional enactments, resort to judge-made exceptions to statutory grants must

be rare."[54]

The sole purpose of the Third Circuit's crafting the <u>Glus</u> exception in 1977

was to dispense with a technical requirement that ensures adequate representation

of a defendant's interests during the EEOC proceedings that preface a civil action.

Such evident disregard of a legislative prerequisite is appropriate, the Third Circuit

emphasized, only in the exceptional case where an unnamed defendant shared a

commonality of interests with a named defendant who had participated in the

prefatory proceedings. In that limited circumstance, "demanding full and technical

compliance would have no relation to the purposes for requiring those procedures

---

[52] <u>See, e.g.</u>, <u>W. Union Tel. Co. v. Lenroot</u>, 323 U.S. 490, 514 (1945) ("[T]he judicial function does not allow us to disregard that which Congress has plainly and constitutionally decreed and to formulate exceptions which we think, for practical reasons, Congress might have made had it thought more about the problem."); <u>United States v. Rutherford</u>, 442 U.S. 544, 559 (1979) ("Whether, as a policy matter, an exemption should be created is a question for legislative judgment, not judicial inference.").

[53] <u>CLS Bank Int'l v. Alice Corp. Pty.</u>, 717 F.3d 1269, 1303 (Fed. Cir. 2013), <u>aff'd</u>, 134 S. Ct. 2347 (2014).

[54] <u>Id.</u>

in the first instance."[55] Such was true only because the interests of the named and

unnamed defendants "were identical in all significant aspects," and the unnamed

defendant "was not harmed by its absence from the EEOC proceedings."[56]

In fact, Glus itself involved an omission that amount to nothing more than a

minor oversight. In Glus, the plaintiff was permitted to bring suit in federal court

against both the local and international chapters of the labor union of which she

was a member, despite her failing to name the international chapter in her EEOC

charge.[57] The Glus court described the close factual nexus between the local and

international union chapters as follows:

> Their liability arises from their participation in the same collective-
> bargaining agreements. The International was the sole union signatory
> to the collective-bargaining agreement for a portion of the period
> where discrimination was found to have taken place; later both the
> International and Local 940 signed the agreements. The
> International's representative was the chief union negotiator at many
> of the negotiation sessions. The International's interests were
> vigorously litigated by Local 940 at the EEOC proceedings. Local 940
> stood firm in its denial of liability. Further, both the International and
> Local 940 were represented by the same attorney, Emil E. Narick,
> Esq., in the district court proceeding until Murphy filed its claim for
> contribution.
>
> . . .
>
> If a settlement had been reached during the EEOC proceeding,

---

[55] Glus v. G. C. Murphy Co., 562 F.2d 880, 889 (3d Cir. 1977).

[56] Schafer v. Bd. of Pub. Educ. of the Sch. Dist. of Pittsburgh, Pa., 903 F.2d 243, 252 (3d Cir. 1990) (citing Glus v. G.C. Murphy Co., 629 F.2d 248, 251 (3d Cir.1980), vacated on other grounds, 451 U.S. 935 (1981)).

[57] Glus v. G. C. Murphy Co., 562 F.2d 880, 888 (3d Cir. 1977).

complete relief could have been obtained from the defendants then present. We also note the finding of the district court that the close relationship between the International and Local 940 could have led the plaintiff to reasonably assume that the interests of both unions were to be represented by Local 940.[58]

Glus, therefore, traced a narrow inconsistency restricted to a very limited set of facts—not a panacea meant to remedy incomplete or haphazard pleading. For the reasons outlined above, its application to the instant matter is inappropriate. I find that all of the Glus factors weigh against Plaintiff. She has failed to establish the requisite "identity of interests" not only because Kalsbeek played a minor role in the alleged discriminatory conduct but also because the employer-employee relationship is a poor predictor of shared interests.

> **2.    Plaintiff's PHRA claims against Kalsbeek stem from discrete acts that are time-barred by the statute of limitations and that cannot be saved by the continuing violation doctrine.**

Plaintiff's claims against Kalsbeek are time-barred. This means that they must satisfy the requirements of the continuing violation theory to survive dismissal. They do not. The "continuing violation theory" is a means by which claimants may "reach back" and recover for certain unlawful employment practices that occurred before the statutory period, so long as the appropriate indicia of a

---

[58] Glus v. G.C. Murphy Co., 629 F.2d 248, 251 (3d Cir.1980), vacated on other grounds, 451 U.S. 935 (1981)).

continuing violation are present.[59] "In order to establish a continuing violation, a

plaintiff must (1) 'demonstrate that at least one act occurred within the filing

period,' and (2) 'that the harassment is more than the occurrence of isolated or

sporadic acts of intentional discrimination.'"[60] Because the Plaintiff here has failed

on both prongs of the continuing violation test, I hold that her claims are also time-

barred and not covered by the continuing violation theory.

As one federal court in the Third Circuit's venire has explained, "[t]he

'continuing violation' theory merely affects the time available to a complainant to

file the charge with the agency or EEOC."[61] The "continuing violation" theory

does not "excuse[ ] the exhaustion requirement."[62] Later, the Third Circuit would

go on to clarify that to invoke the continuing violation theory, a plaintiff must

"allege [a] specific act of discrimination that occurred within the statute of

limitations period."[63] A plaintiff cannot "seek[ ] to invoke the continuing violation

doctrine to resurrect his now moribund claims."[64] Thus, a plaintiff "cannot revive

his time-barred allegations of discrimination or hostile work environment without

---

[59] See Metsopulos v. Runyon, 918 F.Supp. 851, 858 (D.N.J. 1996); National R.R. Passenger
Corp. v. Morgan, 536 U.S. 101, 110–18.

[60] Camplese v. Morgan Stanley Smith Barney, LLC, No. 1:15-CV-00784, 2016 WL 930728, at
*3 (M.D. Pa. Mar. 11, 2016) (Kane, J.) (quoting West v. Phila. Elec. Co., 45 F.3d 744, 754-55
(3d Cir. 1995) (internal quotations omitted)).

[61] Metsopulos, 918 F.Supp. at 858.

[62] Id. at n.2.

[63] Snyder v. Baxter Healthcare, Inc., 393 F. App'x 905, 909 (3d Cir. 2010).

[64] Id.

alleging at least one specific, timely violation."[65]

In fact, as the Supreme Court of the United States has already explained in a similar case, "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action of employment discrimination."[66] Quite the opposite, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify."[67] Thus, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"[68]

Plaintiff's claims against Defendant Kalsbeek in particular date back to 2004.[69] Plaintiff does not dispute this. Rather, she contends that Kalsbeek's harassment constituted a "continuing" effect that ultimately reared its head upon her March 1, 2013 tenure denial.[70] To allege that discrete acts of harassment permeated Plaintiff's everyday work environment for nearly a decade of time is imaginative at best.

The discrimination allegedly instituted by Kalsbeek occurred in separate, distinct past instances. Specifically, Plaintiff suggests that Defendant Kalsbeek,

---

[65] Id.
[66] Morgan, 536 U.S. at 112–13.
[67] Id. at 114.
[68] Id.
[69] Am. Compl., ECF No. 12 ¶¶ 69–82 ("The difficult problem with Professor Kalsbeek began in 2004 early in Professor La Coe's career at Penn State.").
[70] See ECF No. 32 at 14.

with whom the Plaintiff co-taught certain courses, "bad-mouthed her to their students" because "she had rebuffed his disturbing romantic and sexual advances."[71] For instance, Plaintiff claims that Kalsbeek "professed his love for [her]," stating that he "wanted to be in a romantic relationship with her" and that beginning a relationship with him "would be a good path for [her] life to take."[72] Among other incidences, Plaintiff alleged that Kalsbeek once visited her at her home uninvited, gave her a greeting card with his eyeglass prescription, and gifted her a signed copy of the Illustrated Encyclopedia of Sex.[73]

"Nothing takes the taste out of peanut butter quite like unrequited love."[74] When it comes to the working relationship between Plaintiff and Kalsbeek, it appears evident that Kalsbeek's actions were odd and unwelcome, and went a long way to souring the dynamic between the two professors. However, a court's role in such cases is not to pass moral judgment upon the parties but to discern whether such conduct is legally actionable here.

Prior to filing a federal employment discrimination lawsuit, a plaintiff must file an administrative charge with the EEOC or a comparable state agency within

---

[71] ECF No. 32 at 6.
[72] ECF No. 32 at 6.
[73] ECF No. 32 at 6–8.
[74] Charles M. Schulz, Peanuts.

the 300-day statutory time period.[75] Under the PHRA, however, a plaintiff has only 180 days from the date of the alleged discriminatory conduct to initiate administrative action.[76] The instant PHRC Charge was filed by Plaintiff on August 7, 2013, meaning that discrete conduct occurring before February 8, 2013 falls beyond the reach of the limitations period unless otherwise covered by the "continuing violation" theory. That theory is inapplicable here because none of the discrete actions committed by Kalsbeek occurred within that time period, and moreover, it is not evident to this Court that Kalsbeek's actions rose to the level of something more than discrete, isolated incidents. To the extent that Plaintiff contends that Kalsbeek's purported harassment affected her chances of obtaining tenure, I find the connection between the discrete acts of discrimination and the tenure denial to be tenuous and unsubstantiated at best.

If Plaintiff believed that Kalsbeek's conduct rose to sexual discrimination in violation of federal, her remedy was to bring those claims in the appropriate timeframe. When an alleged victim of sexual discrimination chooses not to pursue potential claims, not only do those claims become time-barred, but the evident judicial inference is that the substance of those claims was not so egregious as to rise to the level of discrimination at the time during which they occurred. The

---

[75]  Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000); Snyder v. Baxter Healthcare, Inc., 2009 WL 185993, *2 (W.D.Pa. 2009).

[76]  Woodson v. Scott Paper Co., 109 F.3d 913,925 (3d Cir. 1997).

passage of a decade does nothing to ripen those claims. Quite the opposite, with the eroding of witness memories and the deterioration of evidence, such claims only become more evanescent over time. Because I would hold that Plaintiff's PHRA claims are also time-barred, they must be dismissed for this second, independent reason.

### 3. Plaintiff has failed to plausibly show that Kalsbeek was a "supervisory employee," requiring that her PHRA claims also be dismissed as a matter of law.

"A PHRA plaintiff may advance individual liability claims against supervisory employees who bear responsibility for implementing an allegedly unlawful discriminatory practice."[77] "Direct incidents of harassment by non-supervisory co-employees are not covered by § 955(e) [of the PHRA]. Supervisory employees, however, may be held liable under § 955(e) on the theory that only supervisors can share the discriminatory purpose and intent of the employer that is required for aiding and abetting."[78]

The parties cite to largely the same authorities when it comes to making the determination of who precisely constitutes a "supervisor." "The question of whether a particular individual holds a 'supervisory position' over another must be answered by reference to the power that the individual actually holds, not by

---

[77] O'Donnell v. Pennsylvania Dep't of Corr., 790 F. Supp. 2d 289, 309 (M.D. Pa. 2011) (Carlson, Mag. J.), aff'd, 507 F. App'x 123 (3d Cir. 2012).

[78] Holocheck v. Luzerne Cty. Head Start, Inc., 385 F. Supp. 2d 491, 496-97 (M.D. Pa. 2005) (Vanaskie, C.J.).

reference to his or her formal job title."[79] "In determining whether a <u>de facto</u> supervisory relationship exists, a court must consider whether the defendant could alter the plaintiff's workload, or whether the plaintiff would face internal charges of insubordination for failing to adhere to the defendant's instructions."[80]

Moreover, in 2013, the Supreme Court of the United States in a decision entitled <u>Vance v. Ball State University</u> expounded upon the "clear distinction between supervisors and co-workers" as it pertains to vicarious liability under Title VII for employment discrimination and workplace harassment.[81] In <u>Vance</u>, the Court held "that an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim."[82] "A tangible employment decision requires an official act of the enterprise, a company act."[83] Specifically, a tangible employment action must "effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"[84]

Existing determinations handed down by the Third Circuit are largely in line

---

[79] <u>McCleester v. Mackel</u>, No. CIV.A. 06-120J, 2008 WL 821531, at *9 (W.D. Pa. Mar. 27, 2008) (Gibson, J.).
[80] <u>Id.</u>
[81] 133 S. Ct. 2434 (2013) (Alito, J.).
[82] <u>Id.</u> at *2439.
[83] <u>Id.</u> at 2442.
[84] <u>Id.</u> at 2443 (quoting in <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998) (Kennedy, J.).

with the Supreme Court's discussions in <u>Vance</u>, sharing some of the same determinative factors enumerated by the Supreme Court.  In fact, since <u>Vance's</u> discussion of supervisory liability, several courts in the Third Circuit's venire have applied the test in <u>Vance</u> to the determination of which employees constitute "supervisors" under the PHRA.[85] Although the <u>Vance</u> Court reached the determination of who constitutes a "supervisor" in the context of Title VII vicarious liability, I would join my fellow district courts who have already applied <u>Vance</u> to the PHRA, as the harms against which Title VII and the PHRA protect are sufficiently close and the supervisor determination is necessarily a factual one capable of spanning various statutory regimes.

Applying <u>Vance's</u> definition of a "supervisor" to the instant claim makes it evident that Kalsbeek cannot be liable under the PHRA. Plaintiff argues that because of the "unique nature of university governance," one could find that Kalsbeek exercised supervisory authority over her. Plaintiff contends, for instance, that at one point, Kalsbeek controlled the budget of a course that Plaintiff and others co-taught, at which time Kalsbeek would set faculty meetings, determine the agenda for those meetings, and allegedly attempt to divert funds away from

---

[85] <u>See</u> <u>Kamara v. Horizon House, Inc.</u>, No. CV 13-6728, 2015 WL 9260031, at *10 (E.D. Pa. Dec. 18, 2015); <u>Burlington v. News Corp.</u>, 55 F. Supp. 3d 723, 734 (E.D. Pa. 2014); <u>LeBlanc v. Hill Sch.</u>, No. CIV.A. 14-1674, 2015 WL 144135, at *21 (E.D. Pa. Jan. 12, 2015); <u>Isenhour v. Outsourcing of Millersburg, Inc.</u>, No. 1:14-CV-1170, 2015 WL 6447512, at *8 (M.D. Pa. Oct. 26, 2015); <u>Nelson v. Allan's Waste Water Serv., Inc.</u>, No. 2:11-CV-01334-TFM, 2013 WL 4045787, at *4 (W.D. Pa. Aug. 8, 2013).

Plaintiff.[86] Plaintiff admits that the former Department Head restored any misappropriated funds.[87] Thus, Plaintiff contends, Kalsbeek must be a "de facto" supervisor, because for approximately three to four academic semesters, he exercised "control over the funding of a workplace-program."[88]

Kalsbeek was not Plaintiff's supervisor for several reasons, most apparent of which is that one co-worker of equal status typically does not "supervise" his peers as a matter of law. After Vance, a supervisor must be "empowered by the employer to take tangible employment actions against the victim. The type of temporary control Kalsbeek exercised over Plaintiff, if it even can be termed as such, simply does not rise to the level of authority contemplated in Vance. Plaintiff's own allegations reveal that Kalsbeek's discretion was subject to review and was even reversed on some occasions.

To operate efficiently, employers must afford employees at various levels of the institutional hierarchy some level of independent decision-making authority. What Vance teaches, however, is that supervisory status is determined not by the existence of minor pockets of "control" but by the force and extent of that control as it relates to the employee's ability to carry out tangible employment actions. Here, Plaintiff fails to allege facts plausibly suggesting that Kalsbeek could at any

---

[86] See ECF No. 32 at 17.
[87] Id.
[88] See id. at 16–17.

time fire or promote her of his own accord. The evidence thus far adduced suggests that Kalsbeek's altercations with Plaintiff were personal in nature, not supervisory or otherwise legally attributable to the managing branches of the University.

> **4.    Plaintiff's PHRA retaliation claim must also be dismissed because Plaintiff has failed to plausibly allege a causal connection between Kalsbeek's conduct and any subsequent adverse employment action.**

"In the absence of direct evidence of retaliation, retaliation claims under . . . the PHRA typically proceed under the <u>McDonnell Douglas</u> framework."[89] "[T]he employee bears the initial burden of establishing a prima facie case of retaliation."[90] "[The employee] must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[91]

"Claims under the PHRA are interpreted coextensively with Title VII claims."[92] "[R]etaliation claims must be proved according to traditional principles of but-for causation, not the lessened ['motivating factor'] causation test."[93] "This requires proof that the unlawful retaliation would not have occurred in the absence

---

[89] <u>Fasold v. Justice</u>, 409 F.3d 178, 188 (3d Cir. 2005).
[90] <u>Marra v. Philadelphia Hous. Auth.</u>, 497 F.3d 286, 300 (3d Cir. 2007) (Ambro, J.).
[91] <u>Id.</u> (internal quotations omitted).
[92] <u>Atkinson v. LaFayette Coll.</u>, 460 F.3d 447, 454 (3d Cir. 2006).
[93] <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2533  (2013) (Kennedy, J.).

of the alleged wrongful action or actions of the employer."[94] "Throughout the burden-shifting exercise, the burden of persuasion, including the burden of proving but for causation or causation in fact, remains on the employee."[95]

"It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn."[96] "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific."[97]

In the instant context, Plaintiff has failed to alleged sufficient facts plausibly suggesting that her protected activity in any way caused Defendant Kalsbeek to retaliate against her. First, there are blatant temporal defects with any purported claim of retaliation against Kalsbeek. It seems fundamental that for protected activity to trigger an adverse action, such an adverse action must occur subsequent in time to the protected activity.

Moreover, in determining what might constitute an adverse action in this case for the purposes of gauging causality, the Supreme Court's recent decision in

---

[94] Id.

[95] Cridland v. Kmart Corp., 929 F. Supp. 2d 377, 385 (E.D. Pa. 2013) (internal quotations omitted).

[96] Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997).

[97] Id.

<u>Burlington Northern & Santa Fe Railway Co. v. White</u> is insightful.[98] In that case, the Supreme Court stated that for an employment action to be a "materially adverse" action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[99]

The only action even plausibly rising to the level of material adversity under the <u>Burlington Northern</u> definition is the denial of tenure that ultimately led to Plaintiff' departure from the University. Plaintiff's application for tenure was denied on March 1, 2013.[100] Confusingly, however, Plaintiff's Second Amended Complaint avers—in a manner quite contradictory to a retaliation claim—that Plaintiff's internal complaints as to Kalsbeek's conduct did not occur until 2014, well <u>after</u> she had sustained the adverse action of tenure denial. For good reason, the law does not permit a purportedly aggrieved plaintiff, like Ms. La Coe here, to selectively prosecute retaliation claims against non-offending individuals by engaging in additional protected activity after incurring an adverse employment consequence.

Further, the paragraphs of Plaintiff's Second Amended Complaint detailing

---

[98]  548 U.S. 53 (2006).
[99]  <u>Id.</u> at 68.
[100]  ECF No. 31 at 3.

the alleged retaliation fall well short of the plausibility standard established by the

Supreme Court in <u>Twombly</u> and <u>Iqbal</u>. Specifically, the Second Amended

Complaint alleges the following two paragraphs:

> 108. Professor La Coe has complained to Penn State about his conduct, but it was never addressed adequately, and Professor Kalsbeek continued to disparage her in front of students and to mistreat her.

> 109. To the extent possible, Professor Kalsbeek has acted with revenge and interfered with Professor La Coe's well-being, advancement, performance, and reputation.[101]

Even taking as true that Kalsbeek "acted with revenge" or "interfered with

[Plaintiff's] well-being," those allegations fall well short of facts plausibly entitling

Plaintiff to relief under the guise of a retaliation claim. In fact, as the Supreme

Court itself observed in the <u>Burlington Northern</u> decision, the entire purpose of

requiring a "<u>materially</u>" adverse action is that courts must "separate significant

from trivial harms." [102] To her detriment, Plaintiff has suffered nothing more than

trivial harms at the hands of her co-worker Kalsbeek. Because Plaintiff has failed

to allege sufficient facts to plausibly establish a <u>prima facie</u> case of unlawful

retaliation, in regard to both the causation and adverse action elements, Kalsbeek's

motion to dismiss the PHRA retaliation claim must be granted.

---

[101]   Second Amd. Compl., ECF No. 27 ¶¶ 108–09.
[102]   <u>Burlington Northern</u>, 548 U.S. at 68.

**B.      Plaintiff's Section 1983 Claim Against Defendant Kalsbeek Must Be Dismissed.**

Finally, Plaintiff brings denial of equal protection count pursuant to 42

U.S.C. §1983 against Kalsbeek. Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"It is for violations of such constitutional and statutory rights that 42 U.S.C.

§ 1983 authorizes redress; that section is not itself a source of substantive rights,

but a method for vindicating federal rights elsewhere conferred by those parts of

the United States Constitution and federal statutes that it describes."[103] Success on

a § 1983 claim requires proof of two elements. First, a Plaintiff must prove that she

suffered a "violation of a right secured by the Constitution and laws of the United

States."[104] Second, she must "show that the alleged deprivation was committed by

a person acting under color of state law."[105]

"The ultimate issue in determining whether a person is subject to suit under

§ 1983 is the same question posed in cases arising under the Fourteenth

Amendment: is the alleged infringement of federal rights fairly attributable to the

---

[103]  Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979).
[104]  West v. Atkins, 487 U.S. 42, 48 (1988).
[105]  Id.

State?"[106] The Supreme Court has commented that whether conduct is "fairly

attributable to the State" depends upon "a two-part approach."[107] "First, the

deprivation must be caused by the exercise of some right or privilege created by

the State or by a rule of conduct imposed by the state or by a person for whom the

State is responsible."[108] "Second, the party charged with the deprivation must be a

person who may fairly be said to be a state actor."[109] "Without a limit such as this,

private parties could face constitutional litigation whenever they seek to rely on

some state rule governing their interactions with the community surrounding

them."[110]

Given these stringent pre-requisites before a finding of state action may be

made, "[c]ourts have generally declined to find liability under § 1983 against a co-

worker unless the harassment involved an abuse of authority or position."[111] In

Andrews v. City of Philadelphia, the Honorable Max Rosenn, writing for the Third

Circuit, explained that "[t]o bring a successful claim under 42 U.S.C. § 1983 for a

denial of equal protection, plaintiffs must prove the existence of purposeful

discrimination."[112] Judge Rosenn went on to clarify that "[s]upervisory liability

---

[106] Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982).
[107] Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).
[108] Id.
[109] Id.
[110] Id.
[111] Washington-Pope v. City of Philadelphia, 979 F. Supp. 2d 544, 560 (E.D. Pa. 2013).
[112] Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) (Rosenn, J.).

cannot be based solely upon the doctrine of <u>respondeat superior</u>, but there must be some affirmative conduct by the supervisor that played a role in the discrimination."[113] "The necessary involvement can be shown in two ways," Judge Rosenn added, "either through allegations of personal direction or of actual knowledge and or through proof of direct discrimination by the supervisor."[114]

Specifically, when it came to cases such as this one, which allege violations of 1983 against a complainant's supervisors as well as against a complainant's low-level co-workers  who "had done much of the actual harassing," Judge Rosenn in <u>Andrews</u> affirmed the outright rejection by the district court of that portion of the 1983 claim alleged against the co-workers.[115] Were it not for such an outcome, "[a]s a practical matter this would allow plaintiffs to essentially bring two identical causes of action against the same parties. It would also allow plaintiffs to circumvent the strictures of <u>respondeat superior</u> liability, including the lack of <u>respondeat superior</u> liability under section 1983."[116] "The district court rejected such a tactic and we agree."[117]

In the instant case, the Court believes that certain of the same shortcomings that neutralized Plaintiff's PHRA claims necessarily foreclose her bringing a

---

[113] <u>Id.</u>
[114] <u>Id</u> (internal quotations omitted).
[115] <u>Id.</u> at 1488.
[116] <u>Id.</u>
[117] <u>Id.</u>

successful 1983 claim against Defendant Kalsbeek personally, as a matter of law. Specifically, Plaintiff's 1983 claims Kalsbeek must fail for two separate, independent reasons. First, Kalsbeek, as mere co-worker who exercised no supervisory authority over Plaintiff, is not subject to 1983 liability. Second, Plaintiff's 1983 claims against Kalsbeek are time-barred.

As a starting point, I have already concluded that Kalsbeek did not function in a supervisory capacity in relation to Plaintiff. That analysis, which considered Defendant Kalsbeek's inability to carry out tangible employment actions, among other relevant factors enumerated by the Supreme Court in Vance, applies with equal force to the Section 1983 context. This lack of supervisory control establishes that Kalsbeek does not meet the legal pre-requisites for individual liability under Section 1983. Furthermore, Plaintiff has offered no facts plausibly suggesting affirmative conduct on the part of the University that sanctioned or otherwise directed Kalsbeek's actions in a way that would sweep them within an indirect respondeat superior theory of liability. Thus, because I conclude that Kalsbeek's actions were personal and necessarily not committed "under the color of state law," Plaintiff's Section 1983 claims against him must be dismissed.

Second, as far as the statute of limitations is concerned, "In a Section 1983 claim, a court must look to the state's statute of limitations for personal injury claims; therefore, the law is well-settled that the statute of limitations for a Section

1983 claim in Pennsylvania is two years."[118] As best as the Court can discern,

Plaintiff's alleged confrontations occurred well beyond the two-year statutory

period as prescribed by law, dating in fact in most instances as far back as the 2004

academic year and subsequent semesters. Because I have already held that the

continuing violation theory is insufficient to save these isolated, discrete incidents

of alleged harassment from the PHRA's explicit limitations period, the same is

necessarily true in the Section 1983 context. Thus, because those discrete incidents

fall well beyond the reach of Section 1983's two-year statute of limitations, they

cannot be considered and for this subsequent reason, Plaintiff's Section 1983 claim

is dismissed for this subsequent reason.

## IV.    CONCLUSION

A most difficult, yet fundamental determination for a lawyer is the initial

decision of whom to sue and what claims to bring. Undoubtedly, the academic and

legal debates as to the merits of broad, scattershot pleading will persist in various

forms. What can be gleaned from this case, however, is that, rather unfortunately

for Plaintiff, her primary claims have been put on hold pending disposition of what

ultimately amounted to mere tertiary issues in the grand scheme of this litigation.

What impact the instant analysis on the prosecution of Plaintiff's core claims

has had is a matter worth considering, but ultimately a matter for another day. It

---

[118] Johnson v. Dep't of Corr., No. 1:14-CV-0896, 2014 WL 5823092, at *4 (M.D. Pa. Nov. 10, 2014) (Kane, J.).

suffices to state that all claims brought against Defendant Kalsbeek are procedurally defective and supported by insufficient plausible facts. As such, all claims against Kalsbeek are dismissed with prejudice.

An appropriate Order follows.

BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge